Doren W. GREEN, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 56A03–9603–CR–95.

Court of Appeals of Indiana.

Jan. 30, 1996.

Transfer Denied April 16, 1997.

Donald W. Shelmon, Rensselaer, for Appellant.

Pamela Carter, Attorney General, Preston W. Black, Deputy Attorney General, Office of Attorney General, Indianapolis, for Appellee.

## OPINION

GARRARD, Judge.

The defendant, Doren W. Green ("Green"), brings this interlocutory appeal based on the trial court's denial of his motion to suppress. We accept jurisdiction pursuant to Ind.Appellate Rule 4(B)(6) and we affirm.

### FACTS AND PROCEDURAL HISTORY

The facts most favorable to the judgment indicate that on September 26, 1995, a hearing was held to determine whether probable cause existed for the search of Green's photography studio and his apartment. William Cothran ("Cothran"), an investigator for the Newton County Prosecutor's Office, testified that relatives of Robert Smith ("Smith") submitted a box to the prosecutor's office which contained photographs and a letter. The photographs were of Smith and his girlfriend, Donna Riley ("Riley"), engaged in various sexual acts with Riley's daughter, who was then under fourteen years of age. The box also contained a letter that Smith had written to Riley indicating Smith's involvement with the girl and the possibility of monetary gain being made from the illicit photographs. Smith indicated in the letter that Green was willing and able to purchase the photographs and that Green knew the girl was under age.

Detective Krueger ("Krueger") of the Indiana State Police testified that Loma Green ("Loma"), Green's mother, had contacted Trooper Franko of the Indiana State Police and showed him photographs that had come through Green's studio to be processed. These photographs included enlargements of some of the pornographic photos which were found in Smith's residence. Krueger indicated that he had interviewed the girl and she indicated that in June of 1995, she had engaged in sexual intercourse and oral intercourse with Smith in the presence of her mother and that she had also engaged in oral intercourse with her mother. The girl indicated that several of the photographs were of her performing various sexual acts.

Testimony presented at Green's probable cause hearing indicated that earlier that day, police searched Smith's home and recovered property which included several video tapes, developed and undeveloped film and several packets of information pertaining to Green's photo studio with negatives in those packets. One of the envelopes recovered by police contained seven packs of photographs and negatives which appeared to be processed by Green's studio, "Portraits by Doren," some of which were pornographic depictions of the girl.

The prosecutor's office requested that the court find probable cause for a search warrant for Green's studio and apartment as well as an arrest warrant on the charge of child exploitation. Judge Daniel J. Molter found probable cause for both and issued a search warrant authorizing the search of Green's photography studio and his apartment located above the studio. The search warrant authorized a search for and a seizure of "all film, photos, photographs, pictures, videos, movies, negatives, undeveloped film or any pictorial representation that depict or describe sexual conduct by a child who is less than 16 years of age, or appears to be less than 16 years of age." (R. 13).

The search warrant was executed in the evening hours of September 26, 1995, but police failed to find any materials depicting minors engaged in sexual activities. However, a locked safe was found in the darkroom of Green's studio. Green was asked to open

the safe but he indicated that his parents owned it and that he was unable to open it. After Green's mother stated she did not have the combination, Green then indicated that the safe belonged to his father who was out of town. The safe was removed from the studio, transported to a service station, and arrangements were made to have a locksmith open it.

On September 27, 1995, police requested another search warrant to search the safe, which was granted by Judge Molter. The safe did not contain any items listed in the original search warrant but police did find a plastic bag containing marijuana.

Green was charged with possession of marijuana, a class A misdemeanor.[1] He filed a motion to quash the search warrant and the items seized, which was denied. On February 27, 1996, the trial court certified for interlocutory appeal the issue of the trial court's denial of Green's motion to quash. On March 21, 1996, Green filed a timely petition for interlocutory appeal.

In August 1996, Smith's mother, Arletta Smith ("Arletta") testified at Green's trial in a companion case that on September 26, 1995, she went with her son and daughter to the courthouse. Arletta's son saw Judge Molter in the hallway and started showing him some of the photographs taken from Smith. Arletta and her son and daughter ("the Smiths") were taken to a jury room where Mr. Barce, the deputy prosecuting attorney, was called in to talk with the Smiths. Arletta thought that the investigator (Cothran) and a probation officer were also present.[2]

On August 16, 1996, Green filed a petition to amend his brief based on a new issue brought about by Arletta's testimony and subsequently filed a petition to supplement the record of proceedings, both of which were granted by this court.

## ISSUES

Green presents two issues on interlocutory appeal which we restate as follows:

I. Whether the search of the safe removed from Green's studio constituted an invalid search and seizure.

II. Whether the search warrant was constitutionally invalid because the issuing judge, Judge Molter, was not neutral and detached.

## DISCUSSION AND DECISION

### ISSUE I

■ To protect a citizen's right to be free from unreasonable searches and seizures, our state and federal constitutions require officials to obtain a warrant before conducting searches and seizures. *Hewell v. State,* 471 N.E.2d 1235, 1238 (Ind.Ct.App.1984), *reh'g denied, trans. denied;* U.S. CONST. amend. IV; IND. CONST., art. I, § 11. A warrant may not issue unless an affidavit is submitted to a judge or magistrate, describing with particularity the place to be searched and the items to be seized. *Id.*; IND.CODE § 35–33–5–2. This particularity requirement restricts the scope of the search authorizing seizure of only those things described in the warrant. This is necessary because a warrant which leaves the executing officer with discretion is invalid. *Id.* "The warrant requirement commands that an agent of the government obtain a search warrant from a neutral, detached magistrate prior to undertaking a search of either a person or private property, except under special circumstances fitting within 'certain carefully drawn and well-delineated exceptions.'" *Jones v. State,* 655 N.E.2d 49, 54 (Ind.1995), *reh'g denied* (quot-

---

1. IND.CODE § 35–48–4–11

2. Despite Green's characterization that "further discussions were held" between Judge Molter and the Smiths, Arletta's testimony does not make clear whether any additional conversation took place between Judge Molter and the Smiths after they were taken to the jury room. Amended Appellant's Brief, p. 3; Supplemental Record, p. 9–11. Arletta's testimony provided, in part:

Q. And then from there, could you talk to anybody else at that time?

A. Yes, sir. I—after Mr. Barce was called in. We talked to him. And the investigator, and the Judge—I—and the Probation Officer I think was in here. I don't know who all. Supplemental Record, p. 10–11.

ing *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514–15, 19 L.Ed.2d 576 (1967) ).

■ Green contends that the scope of the search did not extend to the safe because the safe was not listed in the warrant and did not fall within one of the well-delineated exceptions. The state offers *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), to support the proposition that a warrant to search a premises extends to the entire area in which the object of the search may be found. We first note that *Ross* involved the issue of whether police officers, who had legitimately stopped an automobile and had probable cause to believe contraband was concealed somewhere within it, could conduct a probing search of compartments and containers within the vehicle whose contents were not in plain view. Even though *Ross* involved the warrantless search of an automobile, we find the Court's discussion of the lawful search of a fixed premises instructive.

> A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. [footnote omitted] Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. . . . When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.

*Id.* at 820–21, 102 S.Ct. at 2170–71.

Green does not direct this court to, and we cannot locate, any Indiana case which specifically involved the execution of a search warrant which resulted in the removal and subsequent search of a safe which was not specifically listed in the warrant. However, we find the reasoning of the two federal cases offered by the state to be applicable.

In *United States v. Wright,* 704 F.2d 420 (8th Cir.1983), police searched the defendant's residence pursuant to a warrant authorizing the search for various drugs. During the search, police discovered a locked safe. Although the defendant was not present, his roommate informed police that the safe belonged to the defendant. Police were placing the safe in the trunk of the police car when they observed the defendant drive by the area. They stopped the defendant, who agreed to open the safe after police told him that they would force it open if he refused to cooperate. After his conviction for drug possession, the defendant appealed, arguing that the district court erred in denying his motion to suppress the drugs found in the safe. The eighth district court held that the warrant obtained by the police officers permitted them to search the safe. The court, citing *Ross, supra,* concluded:

> The warrant in this case explicitly authorized the police to search the residence at 5276 Thrush for marijuana, cocaine and pentazocine. These drugs obviously could fit within the safe and reasonably could be expected to be found in it. Under these circumstances, the police officers did not exceed the scope of their warrant in searching the safe, and the seizure of the items contained in it thus was lawful. [footnote omitted]

*Id.* at 422.

In *United States v. Johnson,* 709 F.2d 515 (8th Cir.1983), police obtained a search warrant to search Johnson's residence for firearms.[3] In conducting the search, police removed a floor safe from Johnson's bedroom which was opened at the police station without Johnson's consent. The safe contained weapons used to convict him. In response to Johnson's argument on appeal that police had no authority to remove and later open

---

**3.** The affidavit established that Johnson was a convicted felon, making his possession of fire-arms a federal offense.

the safe, the court, citing *Ross, supra*, and *Wright, supra*, held that:

There is no merit to this assertion. A search warrant authorizing the search of defined premises also authorizes the search of containers found on that premises which reasonably might conceal items listed in the warrant. [Citations omitted]. Johnson refused to open the safe when it was first discovered by the officers. Because they were authorized to open it under the warrant at that time, they did not need a second warrant to complete the search of the safe at the police station later.

*Id.* at 516.

A search warrant was issued to search Green's photography studio as well as the apartment located above the studio in which he lived. The search warrant authorized police to search for and seize "film, photos, photographs, pictures, videos, movies, negatives, undeveloped film or any pictorial representation ..." (R. 13). Having obtained the search warrant for the studio and the apartment, police were authorized to search any container found on the premises which might reasonably conceal the items in the warrant. The safe was located in the studio and the various items listed in the warrant could have fit within the safe. It was reasonable to believe that the illicit items in the warrant were concealed in the safe. Similar to *Johnson*, a second warrant to search the safe was not necessary and was undoubtedly secured in an exercise of caution by police. We find that the initial warrant to search Green's apartment and photography studio authorized the search of the safe. Green's inability or refusal to allow the safe to be searched justified the removal of the safe for a subsequent search.[4]

**ISSUE II**

Green contends in his amended petition that the search was invalid because the issuing judge was not a neutral and detached magistrate. We agree with Green's assertion that a search warrant must be issued by a neutral and detached magistrate. "The warrant requirement commands that an agent of the government obtain a search warrant from a neutral, detached magistrate prior to undertaking a search of either a person or private property, except under special circumstances fitting within 'certain carefully drawn and well delineated exceptions.'" *Jones v. State*, 655 N.E.2d 49, 54 (Ind.1995), *reh'g denied* (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514–15, 19 L.Ed.2d 576 (1967)). *See also Shadwick v. City of Tampa*, 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972) (indicating that the Court had long insisted that determination of probable cause must be drawn by a neutral and detached magistrate).

In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Court held that the government's activities in electronically listening to and recording the defendant's words spoken into a telephone in a public telephone booth constituted a Fourth Amendment search and seizure. Further, the Court held that although agents acted with restraint, the search and seizure was unconstitutional without prior judicial sanction even if a magistrate could have constitutionally authorized the search.

It is apparent that the agents in this case acted with restraint. Yet the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer. They were not required, before commencing the search, to present their estimate of probable cause for detached scrutiny by a neutral magistrate.... [T]his Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with than end. Searches conducted without warrants have been held unlawful "notwithstanding facts unquestionably showing probable cause," *Agnello v. United States*, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145, for the Constitution requires "that the deliberate, impartial judgment of a judicial officer ... *be interposed between*

---

4. Based on our holding on this issue, we need not address Green's argument that the safe did not fall within the "plain view doctrine."

*the citizen and the police ...*" *Wong Sun v. United States,* 371 U.S. 471, 481–482, 83 S.Ct. 407, 414, 9 L.Ed.2d 441.

*Id.* at 356–57, 88 S.Ct. at 514 (emphasis added).

In *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the determination of probable cause was made by the Attorney General of the state who was actively in charge of the investigation and later was to be chief prosecutor at the trial. Although the Attorney General was unquestionably authorized as a justice of the peace to issue warrants under then existing state law, the Court held that he was not the neutral and detached magistrate required by the Constitution and found "no escape from the conclusion that the seizure and search of the ... automobile cannot constitutionally rest upon the warrant issued by the state official who was the chief investigator and prosecutor in this case." *Id.* at 453, 91 S.Ct. at 2031. The Court quoted Justice Jackson in offering "[t]he classic statement of the policy underlying the warrant requirement of the Fourth Amendment...." *Id.* at 449, 91 S.Ct. at 2029.

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring those inferences be drawn by a neutral and detached magistrate *instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.* Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.... When the right of privacy must reasonably yield to the right of search is, as a rule, to be *decided by a judicial officer, not by a policeman or Government enforcement agent.*"

*Id.* (quoting *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed.

436 (1948) (ellipsis in original) (emphasis added) ).

In *Shadwick v. City of Tampa,* 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972), the Court held that municipal law clerks, who were authorized by city charter to issue arrest warrants for municipal ordinance violations, qualified as neutral and detached magistrates for Fourth Amendment purposes. The Court held that an issuing magistrate must meet two tests.

He must be neutral and detached, and he must be capable of determining whether probable cause exists for the requested arrest or search. This Court long has insisted that inferences of probable cause be drawn by a "neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."

*Id.* at 350, 92 S.Ct. at 2123 (quoting *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) ). In finding the requisite detachment, the Court indicated:

Whatever else neutrality and detachment might entail, *it is clear that they require severance and disengagement from activities of law enforcement.* There has been no showing whatever here of partiality, or affiliation of these clerks with prosecutors or police. The record shows no connection with any law enforcement activity or authority which would distort the independent judgment the Fourth Amendment required.

*Id.* at 350–51, 92 S.Ct. at 2123 (emphasis added).

Much of the rationale behind the Fourth Amendment protection is the notion that probable cause be determined by a neutral and detached magistrate *instead of or detached from* government agents involved in law enforcement oriented activities. Of significant importance to Fourth Amendment protection, as enunciated by Justice Jackson, is the notion that when the right of privacy must reasonably yield to the right of search, the decision must be made by a judicial officer and not by a policeman or government enforcement agent. *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed.

436 (1948). As *Shadwick, supra,* makes clear, neutrality and detachment clearly entail severance from law enforcement.

■ Green argues, without citation, that the law requires judges to be "independent, free from ex parte communication, impartial and having no personal knowledge of events prior to the same being presented to them and in addition, to being neutral and detached specifically in the matter at hand." (Amended Appellant Brief, p. 8). The requirement that a warrant must be issued by a neutral and detached magistrate does not equate to a constitutional mandate requiring that a judge have no contact with or knowledge of the case or the defendant. The fact that a determination was made by a judge or magistrate is not conclusive on the issue of neutrality; however, the law presumes that a judge is unbiased and unprejudiced in the matters before him. *Jones v. State,* 416 N.E.2d 880, 881 (Ind.Ct.App.1981). Although the law requires that a judge be fair and impartial, trial judges cannot realistically be removed from their communities and placed in a pristine atmosphere to await the next defendant with whom they have had no prior contact or information.

■ In our system of jurisprudence, trial judges are frequently faced with the task of filtering out extraneous information and remaining neutral and detached. In many communities, trial judges are aware of various defendants and their criminal histories and prior dealings with the courts. However, judges are still permitted to conduct bench trials of those individuals and are deemed ethically capable of maintaining the impartiality required in such a trusted position. The law does not prohibit a judge from trying a case on the merits after participating in a probable cause determination. *State ex rel French v. Hendricks Superior Court,* 252 Ind. 213, 247 N.E.2d 519 (1969). The law also does not require a trial judge to disqualify himself although he or she presided over a co-defendant's bench trial. *Jones,* 416

N.E.2d 880. Additionally, probable cause hearings are permissible ex parte proceedings. *Drake v. State,* 555 N.E.2d 1278 (Ind. 1990).[5]

In *Jones v. State,* 416 N.E.2d 880 (Ind.Ct. App.1981), the trial judge presided over a bench trial wherein a co-defendant was tried and convicted. Subsequently, after the defendant waived his right to a jury trial, the same trial judge overruled the defendant's motion for recusal based on the judge's participation in the co-defendant's trial. Despite the trial judge's responsibility of determining the issue of guilt or innocence of the defendant, we held that the trial judge was not required to disqualify himself based on his personal knowledge of the case. We noted that:

> Jones does not direct us to any specific instance in the record wherein *actual prejudice* of Judge Jasper is claimed to be demonstrated. He argues that because the judge had presided at the [co-defendant's] trial his rulings on Jones' motions to suppress, for a continuance, and on objections to evidence may have been improperly influenced. *He makes no mention of any specific instance wherein the judge's rulings were based upon matters learned at the prior trial.* Rather, his argument is that the mere fact of Judge Jasper's participation in the prior bench trial of the co-defendant, Edelen, precluded the same judge from participating in Jones' trial. Such clearly is not the law.

*Id.* at 881 (emphasis added).

Green contends that *Jones* requires recusal when personal knowledge is acquired from extrajudicial sources and, in the case at bar, the trial judge acquired information, knowledge and familiarity with the facts and circumstances "in a manner that cannot even be hinted as judicial. . . ." (Amended Appellant Brief, p. 7). Although we agree that Judge Molter received information outside of a formal courtroom setting, we do not agree

---

5. In *Drake v. State,* 555 N.E.2d 1278 (Ind.1990), the state submitted an ex parte application for issuance of a search warrant for defendant's head and pubic hair and an evidentiary hearing was held without notice given to or the presence of defendant or his counsel. In rejecting the defendant's argument that the trial court erred in issuing a warrant for defendant's person without prior notice or knowledge, the court held that the state was not obligated to give the defendant notice or an opportunity to be heard at a probable cause hearing. *Id.* at 1281.

with Green's characterization of *Jones.* In *Jones,* we responded to the defendant's contention that the trial judge was required to disqualify himself by noting that his contention was "an erroneous construction of the Canon. That personal knowledge which requires recusal is knowledge acquired from extrajudicial sources, not what the judge learned from his participation in the case. (Citations omitted)." *Jones,* 416 N.E.2d at 881. *Jones* does not require the *per se* invalidation of a warrant based on the failure of a judge to recuse him or herself based on any personal knowledge of the case. We also noted in *Jones* that "[t]he only prejudice which will disqualify a judge is a personal prejudice for or against a party" and that "[t]he record must show actual bias or prejudice of the judge against the defendant before a conviction will be reversed on the ground that the trial judge should have disqualified himself." *Id.* at 881.

Green also cites *Stivers v. Knox County Dept. of Public Welfare,* 482 N.E.2d 748 (Ind. Ct.App.1985) to support his argument that any extrajudicial knowledge requires recusal of the trial judge. *Stivers* should be read more narrowly. In *Stivers,* a mother appealed from a judgment finding her daughter a child in need of services and making her a ward of the county department of public welfare. The trial judge who rendered the judgment was also a member of the community child protection team whose members were appointed by the Knox County Department of Public Welfare ("DPW"). The judge was in attendance at meetings in which the daughter's case was discussed and *a recommendation was made by the protection team that legal proceedings be instituted* by the DPW and the protection team. Subsequently, *the DPW and the child protection team instigated legal proceedings,* including a petition for terminating parental rights. The mother moved for a change of venue based on the judge's participation on the child protection team, which was denied by the trial judge. In finding the trial court's denial to be reversible error, we discussed various canons in the code of judicial conduct and noted that "[a]t the worst, this situation is a classic example of an *ex parte* communication contemplated and prohibited by Canon

3(A)(4)." *Id.* at 751. However, in response to the DPW's argument that the trial judge's participation was comparable to a criminal probable cause hearing, we noted that "probable cause hearings are conducted under far different circumstances...." *Id. Stivers* is distinguishable because the trial judge in *Stivers* was a member of the child protection team who recommended and instigated the litigation. In the case at bar, the fact that the trial judge was approached by and had conversation with the Smiths does not make him an advocate or a "member" of any team or party.

*Clark v. State,* 269 Ind. 316, 380 N.E.2d 550 (1978) also offers guidance. In *Clark,* the defendant argued that x-ray photographs of his body were evidence procured through an unlawful search. He contended, *inter alia,* citing *Coolidge, supra,* that the issuing judge had no jurisdiction because he was not neutral and detached. The issuing judge had previously been removed as the presiding judge by virtue of the defendant's right to an automatic change of judge without cause. Our supreme court distinguished the case from *Coolidge* by indicating that "the warrant being questioned was not issued by a state enforcement agent but by a judge qualified under the statute." *Id.,* 380 N.E.2d at 552. The court noted that although the judge was removed, "[h]e had not been removed by reason of bias or prejudice, proven or alleged. *Without a showing to the contrary, we presume that the judge had sufficient neutrality and detachment to make a probable cause determination and issue a warrant, notwithstanding that he had been previously removed as presiding judge." Id.* (emphasis added).

The issue before this court is whether the trial judge was sufficiently neutral and detached, within the constitutional confines of the Fourth Amendment, due to his contact with and initiated by the Smiths. We are not convinced that any contact or knowledge by a judge obtained outside the setting of a formal hearing will *per se* invalidate a search warrant. We believe the better method is to examine the facts and the circumstances on a per case basis to deter-

mine whether or not the issuing judge ·was "neutral and detached."

■ Green has not alleged how Judge Molter's failure to disqualify himself was prejudicial. The state offered three witnesses [6] at Green's probable cause hearing who provided testimony for purposes of establishing probable cause. Green does not allege that the trial judge considered any information, knowledge or evidence which was not made available through testimony at the probable cause hearing. Similar to *Clark, supra,* he makes no mention of any specific instance wherein the judge's rulings were based upon matters learned from his contact with the Smiths. Green's contention consists of alleging that the judge's contact with the Smiths, which was initiated by the Smiths in the hallway of the courthouse, required recusal. We presume the judge had sufficient neutrality and detachment to make the determination of probable cause in the absence of any showing of actual bias or prejudice. *Clark,* 269 Ind. 316, 380 N.E.2d 550. Similar to *Clark* and *Jones,* the defendant has failed to show any bias or prejudice on the part of the trial judge.

Even when reviewing the effect of judicial bias or prejudice on the ultimate determination of criminal guilt or innocence, the appellant is required to do more than allude to potential areas of bias or prejudice. *Jones v. State,* 416 N.E.2d 880 (Ind.Ct.App.1981).[7] We fail to see the logic in invalidating a search warrant on the basis that the issuing judge was not neutral and detached without a showing of such while requiring a showing of

actual bias and prejudice before reversing a criminal conviction on the ground that the trial judge should have disqualified him or herself. It is also noteworthy that Green makes no contention that there was an insufficient basis for probable cause to issue the warrant.[8]

The trial judge's actions do not *ipso facto* require a holding that he was not neutral and detached. Although we acknowledge that the trial judge's contact with the Smiths may have been inappropriate,[9] we do not believe the judge's actions, without a further showing that his neutrality and detachment were impaired, require a holding that the search warrant must be invalidated. Accordingly, we hold that the search warrant was valid and the trial court did not err in failing to suppress the resulting evidence.

Accordingly, we affirm the trial court's order.

HOFFMAN and DARDEN, JJ. concur.

---

6. The state's three witnesses included the investigator from the prosecutor's office, an Indiana State Police detective and the jail employee who received the evidence.

7. In *Wilson v. State,* 263 Ind. 469, 333 N.E.2d 755 (1975), appellant claimed that the search warrant was not issued by a neutral and detached magistrate where the issuing city judge was a law partner of the deputy prosecutor who administered the oath to the affiant policeman. Our supreme court held that "a law partner of a deputy prosecutor is not ipso facto disqualified from issuing a search warrant in a case in which the deputy may be or may become involved in any degree." *Id.,* 333 N.E.2d at 760–61.

8. Although sufficient probable cause will not validate a warrantless search that does not fit within one of the exceptions, the sufficiency of the probable cause may be a factor in the determination of whether a judicial officer is neutral and detached in issuing a warrant.

9. It is difficult to ascertain the nature of Judge Molter's actions given that Green does not offer in his argument the content of the Smiths' conversation with Judge Molter. His only reference to the conversation is to Arletta's testimony. *See supra* note 2. We refuse to speculate on the content of the conversation except to note that it is possible that Judge Molter's participation amounted to assisting the Smiths in procuring a representative of the prosecutor's office to speak with them.