## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 30 2016, 6:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Leeman
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Robert L. Dowell,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

December 30, 2016

Court of Appeals Case No.
09A04-1601-CR-23

Appeal from the Cass Superior
Court

The Honorable Thomas C.
Perrone, Judge

Trial Court Cause No.
09D01-1402-FB-11

**Mathias, Judge.**

[1]     Robert Dowell ("Dowell") was convicted after a jury trial in Cass Superior Court of three felonies and two misdemeanors for making methamphetamine

and possessing methamphetamine, marijuana, and paraphernalia. Dowell challenges the evidence against him as unlawfully seized and as insufficient to sustain his convictions.

We affirm.

## Facts and Procedural History

On the evening of February 18, 2014, Officer Flaude Dillon ("Dillon") of the Logansport Police Department ("LPD") was speaking with Sabrina Brewer ("Brewer") in the lobby of the Cass County jail. Dillon had been summoned to the jail by the Cass County sheriff, to whom Brewer had earlier reported what she was then telling Dillon: Brewer had just been to a home on Wabash Avenue on the Wabash River to pick up her boyfriend's children. As she stood on the front porch, Brewer smelled a "strong chemical odor" coming from the house. Appellant's App. p. 116. Brewer thought it smelled like methamphetamine was being made there. Brewer did not know the exact address but described the house well enough for Dillon to identify it.

Dillon relayed what Brewer told him to Sergeant Adam Morrow ("Morrow") of the LPD. Together with every uniformed LPD officer on duty that night, up to "six or seven" officers in total, Tr. p. 60, Morrow went to the Wabash Avenue house for the stated purpose of checking on the safety and welfare of any other children who might be there. Morrow, a K-9 officer, left his dog in the car because fumes from methamphetamine production can hurt a dog's nose. Morrow and other officers went to the front door and knocked. Standing on the

front porch, Morrow, like Brewer, smelled the distinct chemical odor of methamphetamine production.

[5]     Dowell opened the front door. With him was a woman, Amanda Burden ("Burden"). Morrow and the officers explained to Dowell why they were there. Dowell insisted no one else was in the house, certainly no children, and invited the officers inside so they could see for themselves. Once inside, the officers found the chemical smell to be nearly overwhelming. Headaches and nausea set in, and the officers' eyes and noses began to burn.

[6]     The officers asked Dowell about the smell. Dowell replied that it came from chemicals he used in a makeshift tattooing operation run from the house. Morrow "did [not] agree with that assessment" of the odor's origin. Tr. p. 327. Dowell pointed to a side room near the front door as his tattoo parlor. On a table inside that room, officers saw some tattooing equipment and a blue glass pipe with black residue inside. Morrow asked Dowell for Dowell's consent to search the house for drugs. Dowell refused and told Morrow to get a warrant. The only thing the officers would find in the house, Dowell said, was some marijuana.

[7]     The officers decided to accept Dowell's invitation to seek a search warrant. They handcuffed Dowell and Burden, put them in separate police cars, and swept the house to be sure no one else was inside. Morrow, meanwhile, left for the county courthouse to meet the prosecutor and judge on call that night.

[8]     At the time, Judge Leo T. Burns ("Judge Burns") was judge of the Cass Circuit Court and was on call that evening. Before becoming a judge, he had been an attorney who represented criminal defendants in Cass County as an appointed public defender. Dowell was one of his former clients, most recently in 2004, ten years earlier. From Dowell's perspective, he and Attorney Burns had had an acrimonious relationship. The bases of this alleged acrimony, however, were never made quite clear. "[W]e fell out," Dowell would later testify. Tr. pp. 83-84. "I filed some stuff against his will[;] he was ordered . . . to relinquish the information that I requested. He basically threw a . . . fit about it[.] I mean . . . we had words back and forth[;] we weren't at good standings." Tr. p. 84 (*sic*). Dowell would also later direct voluminous correspondence to the trial court, making nonspecific, unsupported claims of Judge Burns's bias against him. It is not clear from the record whether, on February 18, 2014, Judge Burns recognized the target of Morrow's search warrant application as his former client.

[9]     At the courthouse, Morrow described to Judge Burns what LPD officers had seen at the Wabash Avenue house. Morrow sought a warrant to search both the house and a detached garage on the same property. Judge Burns granted the request as to the house but denied it as to the garage, because "it seems like [the house] is where the probable cause is." Appellant's App. p. 120. The warrant authorized a search for "[e]vidence of criminal drug activity including [deleted] methamphetamine, marijuana, synthetic drugs, paraphernalia and any controlled substances, precursors, chemicals commonly used to manufacture,

weigh, package, sell or consume illegal drugs[.]" Ex. Vol., State's Ex. 1. It was now early in the morning of February 19, 2014.

[10]     Morrow returned to the Wabash Avenue house with the search warrant. There, Morrow met Senior Trooper Michael Lorona ("Lorona"), a member of the "Clandestine Lab" unit of the Indiana State Police. Tr. p. 347. Lorona had been summoned to the house by reports that a possible methamphetamine production site had been discovered there. Armed with Morrow's warrant, Lorona and another trooper entered the house and began their search in Dowell's tattoo parlor. In a closet in that room, Lorona found a collection of ingredients and utensils used to make methamphetamine.[1] Every step of the production process was accounted for by the items in the closet, except for pseudoephedrine, a necessary ingredient at the first step, and completed methamphetamine. Investigators would later examine records of the National Precursor Log Exchange ("NPLEx"), a privately maintained database of pseudoephedrine purchases, showing Dowell purchasing pseudoephedrine in such quantities that Lorona thought indicated a nontherapeutic purpose. On and around the table where the tattooing equipment and blue glass pipe had

---

[1] This included a bottle of ammonium nitrate pellets taken from instant cold packs; opened and emptied instant cold packs; lithium-ion batteries; pliers and wire cutters for breaking open the batteries and extracting the lithium; a bottle of lye drain cleaner; camp fuel, used as a solvent; three bottles identified as "reaction vessels," Tr. p. 613, used to contain the chemical reaction that results from the combination of the above ingredients and produces methamphetamine; a bottle of sulfuric acid drain cleaner; salt, which creates hydrochloric gas when mixed with sulfuric acid; two bottles identified as "[hydrogen chloride] generators," Tr. p. 450, testing positive for hydrochloric gas, used to precipitate solid methamphetamine from the camp fuel solution; and other accoutrements of the production process, including tubing, a digital kitchen scale, coffee filters, funnels, and a makeshift ventilation system.

been seen earlier, Lorona found, among other items, the blue glass pipe with black residue, later identified as burned marijuana; two clear glass pipes, one of which tested positive for methamphetamine; a bag of marijuana; and the butts of two marijuana cigarettes.

[11] Having catalogued and photographed what he found, Lorona removed potentially dangerous items from the room for proper disposal, opened the windows to ventilate the house, and told the LPD officers that his investigation was complete. Dowell and Burden were arrested for conspiracy to manufacture methamphetamine.[2]

[12] Later that day, February 19, 2014, the State charged Dowell in a six-count information with Class B felony dealing in methamphetamine, Class D felony possession of methamphetamine, Class D felony maintaining a common nuisance, Class D felony unlawful possession of a syringe, Class A misdemeanor possession of marijuana, and Class A misdemeanor possession of paraphernalia. The State later added a habitual offender charge which rested in

---

[2] It was the official account below that Dowell and Burden were first detained for their safety and the officers', and only arrested after the search warrant was executed. *See, e.g.,* Tr. pp. 59, 310, 313. Given that the search warrant was not issued until about 12:30 A.M. on February 19, 2014, Ex. Vol., State's Ex. 1, on this account, Dowell would have been arrested some time later that morning. A Cass County sheriff's booking report, however, records that Dowell was booked into the Cass County jail at 11:55 P.M. on February 18, 2014, on the charge of reckless possession of paraphernalia, Appellant's App. p. 21, presumably for the blue glass pipe LPD officers saw inside the Wabash Avenue house before the warrant was applied for. While nothing in Dowell's appeal turns on this issue, we find it disconcerting that law enforcement could lead a man from his house in handcuffs in the middle of the night without being able to give a consistent account of what they were doing. *See* Tr. p. 72 (At the suppression hearing, Morrow "[did]n't recall" whether it was possible that Dowell was already in jail when the warrant was executed.)

part on a felony conviction secured in the 2004 case in which Attorney Burns had represented Dowell.

[13] The next day, February 20, 2014, Dowell appeared before Judge Burns for an initial hearing. By then, Judge Burns had remembered his earlier representation of Dowell. From an abundance of caution and concern for propriety, Judge Burns disclosed that representation in open court, and advised Dowell that "when you do get a chance to talk to your lawyer . . . that [sh]ould be one of the first things that you talk about, . . . whether . . . I [should] continue to be the [j]udge in this case or whether . . . it's more appropriate that somebody else be the [j]udge." Appellant's App. p. 38. Dowell replied that he understood. At a pretrial conference on April 24, 2014, Judge Burns's possible recusal was discussed more fully. Again from an abundance of caution, Judge Burns thought that "discretion up front is better than holding on to something and running into an issue later on, so I will recuse myself . . . ." Appellant's App. pp. 67-68. The case was ultimately transferred to Judge Thomas C. Perrone of Cass Superior Court, who assumed jurisdiction over Dowell's case on May 6, 2014.

[14] On August 26, 2015, Dowell moved to suppress the evidence taken from the Wabash Avenue home under the warrant, arguing that the warrant was not supported by probable cause and had not been issued by a neutral and detached magistrate. At a hearing on September 24, 2015, the court heard the testimony of Morrow and Dowell and the parties' arguments. The court denied the motion in a memorandum order on October 6, 2015.

[15] Dowell's case was tried to a Cass County jury over three days from October 27, 2015, to October 29, 2015. At the close of the State's evidence, Dowell sought and won dismissal of the charge for Class D felony unlawful possession of a syringe. The jury returned guilty verdicts on the five remaining charges and found Dowell to be a habitual offender. On December 17, 2015, the trial court merged the convictions for possessing methamphetamine and maintaining a common nuisance into the conviction for dealing methamphetamine, and sentenced Dowell to an aggregate term of forty-two years in the Department of Correction on the remaining convictions.

[16] This appeal followed. Dowell claims that the search warrant for the Wabash Avenue house was invalid under the Fourth Amendment because it was not issued by a neutral and detached magistrate, and that all the fruits of the search under the warrant therefore should have been suppressed. Dowell claims further that the evidence against him was insufficient to support his convictions because the State did not show he had possession of the evidence taken from the Wabash Avenue house.

## Discussion and Decision

### I. Dowell Waived His Claim of Fourth Amendment Error and Cannot Claim Fourteenth Amendment Error

[17] The Fourth Amendment to the federal constitution requires that a warrant be issued by a "neutral and detached" magistrate. *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326 (1979). When the issuing magistrate fails to exhibit the neutrality and detachment required, for example, by "acting [not] as a judicial officer but

as an adjunct law enforcement officer," *id.* at 327, the warrant will be invalidated. *Id.* It is not settled whether and how a magistrate fails to satisfy this requirement when issuing a warrant for a person whom he previously prosecuted, *see United States v. Villanueva*, 821 F.3d 1226, 1235 (10th Cir. 2016) (declining to address the merits in favor of decision under the good faith exception to the exclusionary rule), or, as here, for a person whom he previously represented as defense counsel under allegedly acrimonious circumstances. *See generally Green v. State*, 676 N.E.2d 755, 762-63 (Ind. Ct. App. 1997) (Neutrality and detachment are presumed in the absence of "any showing of actual bias or prejudice" on the part of the issuing magistrate; mere "contact or knowledge by a judge obtained outside the setting of a formal hearing" will not without more invalidate a warrant.), *trans. denied*.

[18] This case does not afford us the opportunity to consider this question, however, because Dowell's Fourth Amendment claim was waived. Dowell moved to suppress the challenged evidence before trial but concedes that he did not contemporaneously object to its admission at trial. Appellant's Br. p. 21. Contemporaneous objection at trial was required to preserve the issue for appeal, irrespective of a pretrial motion to suppress. *Jackson v. State*, 735 N.E.2d 1146, 1152 (Ind. 2000). Dowell's claim of error was therefore waived unless the error alleged was fundamental. *Trice v. State*, 766 N.E.2d 1180, 1182 (Ind. 2002).

[19] Our supreme court has held that "a claim [for error in admitting unlawfully seized evidence at trial], without more, does not assert fundamental error."

*Brown v. State*, 929 N.E.2d 204, 205 (Ind. 2010). The *Brown* court explained that errors are fundamental only where they "make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process." *Id.* at 207 (internal quotation and citation omitted). With respect to the protections of the Fourth Amendment, and of the exclusionary remedy for its violation, the *Brown* court held that erroneous denial of these protections is fundamental error only when coupled with a "claim of fabrication of evidence," "willful malfeasance," or a "contention that the evidence is not what it appears to be." *Brown*, 929 N.E.2d at 207.[3]

[20] Dowell's claim for Fourth Amendment error does not allege fabrication, willful malfeasance, or "that the evidence is not what it appears to be." *Id.* We are therefore bound to deny that Dowell alleges fundamental error under *Brown* unless he can show an independent basis for finding such error.

[21] For these reasons, Dowell relies on the independent due process guarantee of adjudication by an impartial tribunal under the Fourteenth Amendment.[4] *In re Murchison*, 349 U.S. 133, 136 (1955); *Kennedy v. State*, 258 Ind. 211, 218, 280 N.E.2d 611, 615 (1972). An allegation of actual bias alleges a due process violation, *Murchison*, 349 U.S. at 136 ("Fairness of course requires an absence of

---

[3] The *Brown* court noted that the main run of suppression errors "ordinarily d[o] not cause us to question guilt," *id.*, suggesting that only errors affecting accuracy can be taken as fundamental in this context. But claims alleging "willful malfeasance" will not usually go to accuracy either, *id.*, suggesting that *Brown* does not so limit fundamental Fourth Amendment error.

[4] The State does not address Dowell's argument on this point.

actual bias in the trial of case."), and fundamental error. *Rosendaul v. State*, 864 N.E.2d 1110, 1115 (Ind. Ct. App. 2007) ("[I]f a judge is biased, fundamental error exists."), *trans. denied*; *Ware v. State*, 560 N.E.2d 536, 539 (Ind. Ct. App. 1990) ("If the trial judge was biased against [defendant], it [was] fundamental error . . . .").

[22] Dowell's argument fails, however, because the due process clause of the Fourteenth Amendment has not been held to apply of its own force to warrant application proceedings, and Dowell has not offered argument that it does or should. In addition to an impartial tribunal, due process ordinarily guarantees notice and an opportunity to be heard. *See, e.g., Twining v. New Jersey*, 211 U.S. 78, 111 (1908). Dowell, however, like all other targets of warrant applications, received neither, and does not argue that he should have.

[23] More fundamentally, in *Gerstein v. Pugh*, the Supreme Court held that a pretrial detainee is entitled to a probable cause determination by a neutral and detached magistrate under the Fourth Amendment, but not to an adversary proceeding of the type guaranteed by the due process clause in other contexts. 420 U.S. 103, 126 (1975); *see also id.* at 127 (Stewart, J., concurring) ("I cannot join the [majority's] effort to foreclose any claim that the traditional requirements of constitutional due process are applicable in the context of pretrial detention."). In rejecting the broader guarantees of the due process clause as a basis for its decision in favor of the specific terms of the Fourth Amendment, the *Gerstein* Court reasoned that the "Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests

has always been thought to define the 'process that is due' for seizures of person or property in criminal cases . . . ." *Id.* at 125 fn.27. This reasoning applies to warrant applications with even greater force, as the text of the Fourth Amendment is tailored even more explicitly to the warrant process than to pretrial detention.

[24] Simply said, in the criminal context, the Fourteenth Amendment guarantee is particularly concerned with adjudication *at trial*. *See, e.g., Albright v. Oliver*, 510 U.S. 266, 283 (1994) (Kennedy, J., concurring) ("The constitutional requirements [the Supreme Court] enforced in [cases recognizing due process requirements not specified in the Bill of Rights] ensured fundamental fairness in the determination of guilt at trial."); *Murchison*, 349 U.S. at 137 (Due process forbids a magistrate from acting as grand jury and judge in the same case because the judge could not be "wholly disinterested in the conviction or acquittal of those accused. . . . Fair trials are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer."); *Rosendaul*, 864 N.E.2d at 1115 ("A trial before an impartial judge is an essential element of due process."); *Ware*, 560 N.E.2d at 539 (Defendant "contends the judge's bias against him . . . denied him a fair trial."). Here, even if Judge Burns was actually biased against him in issuing the search warrant, Dowell cannot contend that this denied him a fair trial, as a different, unbiased judge heard Dowell's arguments for suppression, decided to admit the challenged evidence, and presided over the jury trial at which Dowell was convicted.

For these reasons, the proper standard for challenging the neutrality of a magistrate in issuing a warrant is supplied by the Fourth Amendment itself. *Brown* forecloses Dowell from bringing that challenge as a claim for fundamental error. Our supreme court may wish to reconsider *Brown* in that respect, but we cannot. The Fourteenth Amendment does not fly to Dowell's rescue by allowing him to raise the same procedurally defaulted claim merely under a different rubric. Dowell's Fourth Amendment claim was waived.

## II. The State Sufficiently Proved Dowell's Possession and Control Over the Evidence in the Wabash Avenue House

At trial, due process requires that the State bear the burden of proving all elements of the crime charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970); *Powers v. State*, 540 N.E.2d 1225, 1227 (Ind. 1989). On direct appeal, a defendant may attack his conviction as unsupported by evidence sufficient to have satisfied the State's burden.

When reviewing the sufficiency of the evidence, we neither reweigh the evidence nor re-evaluate its credibility. *Henley v. State*, 881 N.E.2d 639, 652 (Ind. 2008). Rather, we view the facts of the case and the reasonable inferences to be drawn from them in the light most favorable to the judgment. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). We affirm unless no reasonable trier of fact could have found the elements of the crime proved beyond a reasonable doubt. *Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007).

[28] To convict Dowell of Class B felony dealing in methamphetamine,[5] the State was required to prove beyond a reasonable doubt that Dowell "knowingly or intentionally . . . manufacture[d] . . . methamphetamine . . . ." Ind. Code § 35-48-4-1.1(a) (2013). Manufacturing means

> the production, preparation, propagation, compounding, conversion, or processing of [methamphetamine], either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of [methamphetamine] or labeling or relabeling of its container.

*Id.* at § 1-18(1)(A).

[29] Though the statute does not in terms refer to possession, "[w]e accept that it is impossible to knowingly or intentionally manufacture methamphetamine without first *possessing* the chemical precursors [of methamphetamine and other necessaries] with the intent to make the drug. Methamphetamine cannot be conjured up out of thin air." *Iddings v. State*, 772 N.E.2d 1006, 1016 (Ind. Ct. App. 2002) (finding possession of precursors with intent to manufacture not to be a factually lesser included offense of manufacturing in defendant's case) (emphasis added), *trans. denied*; *see also Hundley v. State*, 915 N.E.2d 575, 579–81 (Ind. Ct. App. 2011) (State had to and did prove that defendant possessed camp

---

[5] Dowell's convictions for possession of methamphetamine and maintaining a common nuisance were merged into the conviction for dealing methamphetamine. *See* ¶ 15 *supra*. Accordingly, we review only that latter conviction.

site where methamphetamine was manufactured.), *trans. denied*. Here, therefore, the State had to prove that Dowell possessed the ingredients and equipment for manufacturing methamphetamine found in the closet of Dowell's tattoo parlor.

[30]　Possession may be actual or constructive. *Holmes v. State*, 785 N.E.2d 658, 660 (Ind. Ct. App. 2003). As the LPD did not come upon Dowell actually manufacturing methamphetamine, the State was required to prove Dowell's constructive possession of the incriminating evidence. "Constructive possession is established by showing that the defendant [had] the intent and capability to maintain dominion and control over" the incriminating evidence. *Id.* A defendant's exclusive possession or control of premises where such evidence is found, without more, permits an inference that he knew of and was capable of controlling it. *Id.*; *see also Chandler v. State*, 816 N.E.2d 464, 467 (Ind. Ct. App. 2004) ("[T]he law infers the party in possession of the premises is capable of exercising dominion and control over all items on the premises.").

[31]　For the purposes of exclusivity, possession or control refers to "the defendant's relation to the place where the [evidence] is found: whether the defendant has the power, by way of legal authority or in a practical sense, to control the place where . . . the [evidence] is found." *Jones v. State*, 807 N.E.2d 58, 65 (Ind. Ct. App. 2004), *trans. denied*. In this light, there was ample basis for the jury to find that Dowell, and only Dowell, had control over the Wabash Avenue house.[6]

---

[6] At his sworn indigency hearing before Judge Burns, Dowell said that he "lived" at the Wabash Avenue house but that it was owned by his father, Appellant's App. p. 48, presumably the "Victor Dowell" named in

Dowell answered the door when LPD officers first came knocking; Dowell invited the officers inside to see that no one was present but he and Burden; Dowell told the officers that he ran a tattoo parlor from the house, pointing them to the room where the methamphetamine was produced; Dowell refused his consent to a search of the house; and Dowell told the officers that they would find marijuana in the house, which, like the evidence of methamphetamine production, was then located in Dowell's tattoo parlor. No evidence before the jury indicated that Burden had any say over what went on at the Wabash Avenue house. Burden stood silent as Dowell first granted and then denied the LPD officers access to the house. Dowell's unsupported assertion to the contrary notwithstanding, it was Brewer's boyfriend, not Burden, whose children were said to have been picked up from the house that night. No evidence before the jury would have permitted it to find that Burden was anything but a visitor to Dowell's home.

[32] From this evidence and all reasonable inferences drawn in favor of the judgment below, a reasonable trier of fact could have concluded that Dowell had the intent and capability to control the ingredients and equipment for manufacturing methamphetamine found in the closet of Dowell's tattoo parlor.

the search warrant. Ex. Vol., State's Ex. 1. The younger Dowell did not pay cash rent to his father, he explained, but "d[id] the remodeling there, painting and such" apparently as a form of in-kind rent. Appellant's App. pp. 48-49. This testimony was, of course, never put to the jury. The search warrant itself was introduced at trial, but only to show its effect on the LPD officers serving it. Tr. p. 330 ("[W]hat [the State] need[s] to put before the jury is evidence that the officers . . . weren't just kicking in somebody's door without authorization . . . .") The warrant would have been hearsay violative of the Confrontation Clause, U.S. Const. amend. VI, if offered for the truth of its assertions that the Wabash Avenue house was "currently inhabited by Robert Dowell" and "owned by Victor Dowell . . . ." Ex. Vol., State's Ex. 1.

Sufficient evidence supported Dowell's conviction for dealing in methamphetamine.

## Conclusion

[33] Dowell's claim of Fourth Amendment error was waived, and sufficient evidence proved his possession of the incriminating evidence needed to convict. For these reasons, Dowell's convictions are affirmed.

[34] Affirmed.

Robb, J., and Brown, J., concur.